

**ORDERED in the Southern District of Florida on October 29, 2012.**

A. Jay Cristol, Judge
United States Bankruptcy Court

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

IN RE:

NORMAN CANO,

    Debtor.
_____/

NORMAN CANO,

    Plaintiff,

vs.

ARNOLDO CANO, and WELLS FARGO
BANK, N.A., JPMORGAN CHASE & CO.,
d/b/a CHASE BANK,

    Defendants.
_____/

CASE NO. 12-22532-BKC-AJC

Chapter 11

Adv. No. 12-1420-BKC-AJC-A

## ORDER ON A TALE OF TWO BROTHERS AND ALMOST TWO MILLION DOLLARS

Once upon a time there were two brothers, Norman and Arnoldo, originally from Nicaragua, who lived in Miami. Also, there is a Florida Mega Money lottery ticket, with numbers 8, 11, 15, 24, and 18, worth almost $2,000,000 to its owner.

Each brother claimed that he had bought the lottery ticket and that the proceeds of the win belong to him. Obviously, one brother is a liar. But which one?

Norman filed this bankruptcy case claiming entitlement to the proceeds of the winning lottery ticket. He asserts the proceeds are property of the estate and seeks turnover of the proceeds from Arnoldo.

This proceeding came before this Court for trial on the Adversary Complaint filed by Plaintiff Norman Cano, seeking relief under various theories against Defendant Arnoldo Cano, Wells Fargo Bank, N.A., and JPMorgan Chase d/b/a Chase Bank, based on allegations that Norman Cano bought the winning lottery ticket, that he gave the ticket to Arnoldo Cano to claim the lottery proceeds for him, and that Arnoldo Cano has prevented him from enjoying the proceeds. Arnoldo Cano has defended this proceeding by claiming that he, Arnoldo Cano, bought the winning lottery ticket and is entitled to all the lottery proceeds. The Court held a trial in this proceeding to determine who purchased the winning lottery ticket and who owns the proceeds of same. The trial concluded on October 12, 2012.

To begin, the Court has sympathy for brother Norman, the Debtor, who left school after the third grade and has worked at hard labor all his life. He now lives in Miami and spends his days at hard labor on construction jobs, earning little when he has work; but, sympathy cannot be the factor for deciding this case.

The other brother, Arnoldo, has also had a difficult life by virtue of his wife being manic depressive bi-polar, leaving him with the burden of caring for his spouse while also working hard and raising a son.  But as in the case of his brother, sympathy cannot be the factor in deciding this case.

The Court tried the case for almost two days and considered the testimony of five witnesses and both brothers.  The Court recognizes it has the power to make a credibility choice, but making a choice based on the testimony of the two brothers leaves a 50% chance of error.  Only the two brothers know who the liar is and who the honest person telling the truth is.  Of course, the best dispositive item of evidence on which brother bought the winning lottery ticket would have been the video tape showing the purchase of the ticket at 9:37 PM on the evening of September 9, 2011 at the bodega.  But alas, the tape cannot be found.  Thus, upon consideration of the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The Court heard the testimony of Plaintiff Norman Cano and Defendant Arnoldo Cano, as well as of Plaintiff's witnesses, Tomas Santana, Jr. and Victor Baez, Defendant's witness, Gonzalo Aviles, and Defendant's rebuttal witness, Daisy Garcia. The Court also considered the deposition testimony of Plaintiff's witness, Aracely Ramos, based on Plaintiff's counsel's proffer on the record of the relevant testimony from that deposition.  The Court admitted into evidence without objection Defendant's Exhibits A, B, C, D, H, and I.

Tomas Santana is a store clerk at the bodega, L&R, where the winning lottery ticket was sold.  He works at the bodega with his father and Aracely Ramos.  L&R is located on 25th Street and Biscayne Boulevard, down the block from where the Debtor, Norman, resides.  Mr. Santana

testified that Norman came to L&R "religiously" for years on a daily basis, between 4:00 PM and 11:00 PM, to buy lottery tickets. Norman usually came to the store by himself and picked his own numbers for his lottery tickets. Notwithstanding, Mr. Santana could not say he had sold the winning lottery ticket nor did he know if he sold the winning lottery ticket to Norman. He also testified on cross-examination that he does not remember ever seeing the winning ticket.

Mr. Santana stated that he never recalled meeting Arnoldo and does not recall seeing Arnoldo in L&R, but the Court believes Mr. Santana's memory is not perfect. While Mr. Santana is a credible witness, his testimony provided no persuasive evidence to indicate which brother purchased the winning lottery ticket, or for that matter, who sold the winning ticket.

Norman Cano testified on direct examination that he always played the Mega Money lottery every Tuesday and Friday for 13 years, and he always played the same numbers. He stated he purchased his tickets at the bodega, L&R, which is a 10 to 15 minute walk from his residence.

Norman testified that on the day he said he bought the winning ticket, he had worked all day. He returned to his residence at about 8:00 PM, commuting home about 2 to 3 hours by bus and train. He said he had gotten "too much sun" during the day and didn't feel well. He called Arnoldo from the bus, who told him to take an Alka Seltzer, but he says he never saw his brother that evening. Norman testified that he did not talk to Arnoldo "very often" and that Arnoldo had never been in his apartment that he shared with Daisy Garcia prior to September 9, 2011. (Daisy Garcia has lived with Norman in the apartment for several years. They had a romantic relationship for about two years but they are no longer romantically involved.)

Norman testified that when he returned home, Daisy was in the apartment. He showered, took Alka Seltzer and then went to play the lottery at the L&R bodega about 45 minutes later, or

around 9:00 PM.  (It is about a 10 to 15 minute walk to the bodega from the Debtor's apartment.)  That evening, Mario Akayo came by the apartment.

At 9:45 AM or 10:00 AM the following morning, Norman awakened and walked to a store on NE 2nd Avenue and 25th Street because the L&R bodega was not yet open.  Norman checked the lottery numbers and testified that he knew he had the winning lottery ticket because he knew his numbers "by heart".  He stated that he called Arnoldo an hour or two later to tell him, and Arnoldo told him to keep it a secret.  But, Norman says he went upstairs to show his neighbor Victor the winning ticket.

Arnoldo came to Norman's apartment about an hour later and took the ticket.  On Sunday, Norman stated that Arnoldo told him to get two changes of clothes because "we're" going to Tallahassee.  They left to Tallahassee by rental car at around 10:00 AM and arrived at about 3, 4 or 5 in the afternoon.  They rented a hotel room in Tallahassee; and, on Monday, Norman testified that "we" were first at the lottery office to cash the ticket, at around 7:00 AM.  They were done around 10:00 AM and left for Miami, where they stayed in a hotel for a week.

After the hotel stay, Norman testified he stayed in a house of Arnoldo's with Arnoldo, while he was waiting for his money.  Norman stayed there for four months.  In the meantime, Norman testified that he went with Arnoldo to buy clothes and a 2011 Toyota Camry titled in Arnoldo's name because Arnoldo has "papers".  Norman got a credit card, but he could not state with what bank or to which account it was linked.  Norman and Arnoldo bought two Rolex watches that they each selected and for which Norman says he authorized the purchase.  There is also a house that Norman said was bought with the lottery winnings and titled in Arnoldo's name because Norman was not a legal citizen/resident.  The house is at 7521 Easton Street in Broward County.

Norman testified that, for six months, Arnoldo would give Norman $5,000 at a time when he would ask for money, but he would take back $500. He said he received a total of about $120,000 from Arnoldo. Norman said he transferred money to his child who lives in Houston, Texas, and Arnoldo sent $300 a month to his child. However, since the accounts have been frozen, no payments have been sent to Norman's child. Norman made of point of saying he has no liquor problem.

On cross-examination, it was discovered that the Debtor misrepresented his prior address on question 15 in his Statement of Financial Affairs. He was also evasive and non-responsive to many of the questions posed to him by Arnoldo's counsel. Norman admitted he was too sick to have dinner the night of September 9, 2011 but he was not too sick to go to the bodega to buy lottery tickets.

Norman said that the September 9 lottery win was the first time he won the Mega Money lottery. He had won other lotteries, of between $5,000 and $10,000, but "not much more".

At trial, Norman testified that he had shown the winning ticket to Victor. However, Norman testified during his deposition that he did not tell anyone about the winning lottery ticket. When asked why he didn't reveal that during his deposition, Norman said it was because Arnoldo told him not say anything lest someone try to kill him for the ticket. Such testimony at the time of the deposition is inconsistent, given that the risk of someone stealing the ticket, or trying to kill for the ticket, was gone by the time of the deposition.

Norman admitted that he and his brother never had any plan for disbursing the lottery winnings; just that Arnoldo would cash the ticket and give Norman the money. However, such testimony contradicts the Complaint. In paragraph 8 of the Complaint, Norman states that

Arnoldo told him he could not cash the ticket because of Norman's illegal status so they had an agreement.

Norman further testified he went with Arnoldo to buy the Camry which was put in Arnoldo's name, but he stated he "thought he would transfer the car to my name." At his deposition though, Norman testified that he was "hoping" his brother would transfer the car to him. Norman also said he knew that Arnoldo purchased, in his own name, real property in Miami, Nicaragua and Costa Rica, a $100,000 C.D., a watch and U.S. Treasury bonds. Norman stated Arnoldo opened an investment account and other bank account in his name, and he bought a bus and a taxi cab. Norman lists many of the foregoing assets as his own in his Schedules.

Tellingly, while Norman testified on direct that he played the same five sets of numbers two times every week for the last 13 years, and that he knew those numbers by heart, Norman was not able to recite the complete series of numbers at trial.

Victor Baez, Norman's neighbor at the apartment building, testified that he and Norman would often sit in front of their building and talk and would sometimes walk to the bodega together. He said that Norman played the lottery all the time.

Mr. Baez testified that he was at home on the morning of September 10, 2011 cooking breakfast for his family when Norman knocked at his door at around 10:00 or 11:00 in the morning. He said Norman was emotional and shaking. He thought Norman was not himself. Norman told him he had won "the big one", and was crying. Mr. Baez said that Norman showed him the winning ticket and the play card. He was absolutely certain that the winning set of numbers on the ticket that Norman showed him was NOT listed as the first set of numbers on the ticket. He said it was definitely not the first line of numbers or the last line, but maybe it was the

second line or second series of numbers that were the winning numbers. Mr. Baez's testimony directly contradicts Exhibit B, and the testimony of the Debtor.

Gonzalo Aviles is a personal banker at Wells Fargo Bank. He testified that he knows Arnoldo and Norman. He assisted Arnoldo in opening accounts at the bank and helped Arnoldo structure the wiring of the lottery winnings from Tallahassee. He stated that Norman would come to the bank with Arnoldo about once a week. Mr. Aviles said that Norman often had blood shot eyes and smelled of whiskey when he came to the bank, and he would slur his words when speaking.

Mr. Aviles testified that it was Arnoldo who always gave instructions regarding the finances and transactions. He said that Arnoldo gave Norman a credit card, and Arnoldo would frequently withdraw $5,000 to $10,000 and hand it to Norman. He also stated that it was Arnoldo who told him that he, Arnoldo, won the lottery. Norman nodded his head in agreement, acknowledging that Arnoldo won the lottery. Mr. Aviles testified that Norman never disputed that Arnoldo won the lottery.

On cross-examination, Mr. Aviles admitted to being indebted to Arnoldo. Arnoldo loaned Mr. Aviles $10,000 which Mr. Aviles is paying back to him $100 per month at 1% interest. There is no note or document for the loan. Mr. Aviles also admitted to having visited Arnoldo at his home on a couple of occasions. Once, he took a friend to Arnoldo's to possibly be a tenant in one of Arnoldo's properties, and the other time he went to discuss recommending Arnoldo to one of the bank's investment bankers. Mr. Aviles' friend ultimately rented Arnoldo's house. The Court believes the testimony of Mr. Aviles is credible at times but is also self-serving, given his close relationship with Arnoldo and his indebtedness to Arnoldo.

Daisy Garcia was called as an impeachment witness. Ms. Garcia testified that she has lived at 452 NE 25th Street, Apt #2, in Miami for the past four years and confirmed that Norman Cano lives with her in the apartment, but she emphasized that Norman was not her boyfriend and that she did not have a romantic relationship with Norman. She testified she has never met Arnoldo and Arnoldo has never been to the apartment.

Ms. Garcia testified that on September 9, 2011, she went to Mount Sinai Hospital because she was not feeling well that day. She was released from the hospital around 5:00 or 6:00 that evening and returned home at about 7:00 PM. Ms. Garcia said that Norman and Mario were both at the apartment when she got home.

The Court believes Daisy Garcia is not forthcoming and therefore not credible. During the course of the trial, she changed her testimony with regard to her relationship with Norman. In the Defendant's case, Ms. Garcia admitted to being in a romantic relationship with Norman at one time but she said she lied about it because it was supposed to be a secret. Her misrepresentation to the Court under oath calls into question her credibility; and, the Court puts little, if no, weight on Ms. Garcia's testimony that she never met Arnoldo and never saw him in the apartment.

Finally, the Defendant testified. The Court found Arnoldo to be forthcoming and responsive, and believes his testimony is credible. Arnoldo Cano lived in North Miami for 20 years, until five months ago when he moved to a home in Hollywood, Florida. Arnoldo has been married for 24 years and has one son, age 15 years old. His wife suffers from manic depressive bi-polar disorder. He testified that since he won the lottery, he has not been working and is spending more time with his son. (Arnoldo worked in concrete construction for over 20 years.)

Arnoldo came to the United States when Norman was about 12 or 13 years old. Arnoldo brought Norman to the United States in 1994, when Norman was about 24 years old, because one of his sisters asked him to help out. Arnoldo paid for Norman's visa, plane tickets to the United States and other expenses. When Norman arrived, he lived with Arnoldo in Arnoldo's one bedroom apartment in Miami Springs. They moved to a 2 bedroom apartment and then eventually into a house where there was a room for Norman. Arnoldo stated that he believes he had a good relationship with his brother and he loves Norman.

However, Arnoldo testified that Norman would oftentimes not return home, particularly during the weekends, after he received his paychecks. Arnoldo stated that Norman would spend that time drinking to excess and cavorting with women of questionable character. Sometimes, Arnoldo would get a phone call from Norman asking to be picked up; sometimes he would be called by others to pick up Norman.

Arnoldo testified that Norman told him he missed Nicaragua and wanted to go back, so Arnoldo told Norman to save his money, while Arnoldo took care of Norman's room and board, so that he could save enough to go back. Arnoldo said that after one year, he asked Norman how much Norman saved, and Norman had not saved anything.

Arnoldo testified he has played the Mega Money lottery since 1988 when it first started. He plays twice a week and plays the same numbers every time. When asked to recite the numbers that he plays, he was able to recite all five series of numbers in the order that they appear in the winning lottery ticket (Exhibit B).

Arnoldo testified that he bought the winning lottery ticket at the bodega on 25th Street and Biscayne Boulevard after he went to see Norman. He said that he has bought tickets at that bodega many times. On September 9, 2011, Arnoldo was working on Atlantic Boulevard in

Broward County when Norman called from a worksite in southwest Miami to ask Arnoldo to come pick him up because he was not feeling well.  Arnoldo said he could not pick him up.  Later, Norman called Arnoldo from the bus on his way home and said he would not stop vomiting.  Arnoldo testified he told Norman he would stop by later to bring him some medication to stop vomiting.  After returning home for dinner, Arnoldo called Norman who told him he was still vomiting, so Arnoldo took lemons and Perrier water to Norman at the apartment.  It was past 9:00 PM and Arnoldo spent about 15 minutes with Norman and then left.  After leaving Norman, Arnoldo stopped at L&R and bought a lottery ticket.  He said he bought the ticket "from the man who testified in court the other day" – Tomas Santana.  He saw the result at the bread store the following morning.

He invited Norman to go with him to Tallahassee to collect the winnings.  Arnoldo testified that Norman was still not well on Saturday, so he picked him up and Norman spent the day at Arnoldo's but returned home that night so he could feed his cat.  (Arnoldo testified that Norman called him that Saturday night and he heard loud music in the background.  Arnoldo told Norman to get some sleep because they were going to Tallahassee the next day.)  They left Miami the next day, Sunday, around 10:00 and went to the lottery office on September 12 at about 8:00 AM.  The lady at the lottery office asked if both Norman and Arnoldo were claiming the prize, but Arnoldo said only he was claiming the prize, so Norman had to go wait in the lobby.

They returned on September 12 to Miami and Norman suggested they stay in a hotel near the bank.  They stayed in the Ramada for one night, according to Arnoldo.  On September 15 the lottery proceeds, approximately $1,840,000, were transferred to Arnoldo's account.

On cross-examination, Arnoldo testified about the various gifts he bestowed upon his nine siblings who live in Nicaragua and Costa Rica. He gave to Medardo about $6,000 to $8,000 by Western Union, wire transfers and by hand delivery. He gave Augusto about the same amount of money on 2 separate visits and he bought a house in Las Mederas, Nicaragua which is titled in Augusto's name. Arnoldo bought a home for his deceased sister's children. His relatives bought a taxi and a bus from the funds, but Arnoldo did not personally buy those items nor are they purchased in his name. Arnoldo sent a $7,000 truck and paid the taxes on it to have it sent. Roque received a couple of hundreds of dollars, Raymundo received a couple of thousands of dollars, Alvaro received about $8,000 plus an apartment and Omar received about $90,000 to help buy a house and a church, and to help Patricia. Martina received nothing.

Arnoldo testified that he gave Norman almost $240,000 but stopped giving him money because Norman would not seek treatment for what Arnoldo believed was a drinking problem. Norman's attorneys asked Arnoldo if that was the "only reason" he stopped giving Norman money – as if that may not be enough of a reason. The Court believes such line of questioning does not serve Norman well.

## CONCLUSIONS OF LAW

After due consideration of the evidence, the Court finds that much of the testimony of the non-party witnesses is immaterial to the issue of who purchased the winning lottery ticket. The Court finds some of Plaintiff Norman Cano's testimony credible; however, more of it was evasive and quite a bit of it was just not credible. The Court finds the testimony of Defendant Arnoldo Cano credible and persuasive. The Court is particularly persuaded by Defendant's Exhibit B, marked and identified as a copy of the winning lottery ticket, coupled together with the testimony of Norman Cano and Arnoldo Cano on the issue of who bought the winning lottery

ticket.  The Court believes that the totality of the evidence supports the conclusion that Norman Cano is lying about having purchased the winning lottery ticket and that Arnoldo Cano is telling the truth and was the one who purchased the winning lottery ticket, solely for his benefit.  *Grupo Mexicano de Desarrollo v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) (determining the credibility of the witnesses is entirely within the province of the court and due regard shall be given to the opportunity of the court to judge the credibility of the witnesses).

All counts of Plaintiff's Adversary Complaint are premised on the allegation that Plaintiff Norman Cano purchased the winning lottery ticket.  Because this Court finds that Defendant Arnoldo Cano purchased the winning lottery ticket solely for his own benefit, this Court concludes that Arnoldo Cano is the legal owner of the proceeds from the lottery prize.  As a result, all Counts of the Adversary Complaint fail as a matter of law.

Count I alleges a claim based on Federal Constructive Fraud and Fraudulent Transfer pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550.  Because Arnoldo Cano has purchased the winning lottery ticket for his sole benefit, he owns the proceeds of the lottery prize, and there is no factual basis to support Plaintiff's federal constructive fraud claim or fraudulent transfer claim pursuant to 11 U.S.C. § 548(a)(1)(B) and 11 U.S.C. § 550, and these claims fail as a matter of law.

Count II alleges a claim based on State Constructive Fraudulent Transfer to Insider Recovery of Property pursuant to section 726.106(2), Florida Statutes, and 11 U.S.C. § 550.  Because Arnoldo Cano purchased the winning lottery ticket, and owns the proceeds of the lottery prize, there is no factual basis to support Plaintiff's claim for state constructive fraudulent transfer to insider recovery of property pursuant to § 726.106(2), Florida Statutes or 11 U.S.C. § 550, and this claim fail as a matter of law.

Count III alleges claims based on State Fraudulent Transfer and Fraudulent Transfer pursuant to § 726.106(1) and 11 U.S.C. § 550.  Because Arnoldo Cano has purchased the winning lottery ticket, and owns the proceeds of the lottery prize, there is no factual basis to support Plaintiff's claim for state constructive fraudulent transfer to insider recovery of property pursuant to § 726.106(2), Florida Statutes or 11 U.S.C. § 550, and these claims fail as a matter of law.

Count IV alleges a claim for bailment.  Because Arnoldo Cano is found to have purchased the winning lottery ticket, and owned the proceeds of the lottery prize, there is no factual basis to support Plaintiff's claim for bailment, and this claim fails as a matter of law.

Count V alleges a claim for a constructive trust.  Because Arnoldo Cano is found to have purchased the winning lottery ticket, and therefore owns the proceeds of the lottery prize, there is no factual basis to support Plaintiff's claim for constructive trust, and this claim fails as a matter of law.

Count VI alleges a claim for turnover pursuant to 11 U.S.C. §§ 542 and 550.  Because Arnoldo Cano purchased the winning lottery ticket, and owns the proceeds of the lottery prize, there is no factual basis to support Plaintiff's claim for turnover, and this claim fails as a matter of law.

Count VII alleges a claim for an administrative freeze of the proceeds of the lottery prize being held in several accounts with Defendant Wells Fargo Bank, N.A. and Defendant JPMorgan Chase & Co., d/b/a Chase Bank, demanding that the accounts remain frozen until this adversary proceeding is fully adjudicated.  On June 7, 2012, this Court granted Plaintiff's Emergency Motion to Enjoin Defendant from Touching Assets of the Estate and Freezing Accounts at Wells Fargo Bank and Chase Bank, and froze all accounts for which Arnoldo Cano has signatory

authority. This Court modified its Order on July 11, 2012, to allow Arnoldo Cano immediate access to $10,000 from his accounts at Wells Fargo Bank, and again on July 17, 2012, allowing Arnoldo Cano immediate access to an additional $20,000 from his accounts at Wells Fargo Bank. Because Arnoldo Cano is found to have purchased the winning lottery ticket, and because he solely owns the proceeds of the lottery prize, the proceeds in the frozen bank accounts are not assets or property of the bankruptcy estate. The claim for administrative freeze fails as a matter of law, the June 7, 2012 Order will be vacated, and Arnoldo Cano will be granted immediate access to all accounts frozen by the June 7, 2012 Order.

Finally, even if the Court has erred in finding the testimony of Arnoldo more persuasive than that of his brother Norman, the scales of justice would be left evenly balanced with neither brother having been persuasive. In such instance, Norman's claims would fail as the burden of proof is on Norman to persuade the Court that he bought the winning lottery ticket and was entitled to the whole of the proceeds. However, Norman failed to so persuade this Court. Thus, having failed to carry his burden of proof, Norman's claims against Arnoldo fail.

This Court will enter a separate Judgment consistent with these Findings of Fact and Conclusions of Law. This Court will consider taxation of costs and attorneys' fees, if appropriate.

###

Submitted by:

Jeffrey S. Lapin, Esq.
N. Alejandra Arroyave, Esq.
Lapin & Leichtling, LLP
255 Alhambra Circle
Suite 1250
Coral Gables, Florida 33134
Telephone: (305) 569-4100
JLapin@ll-lawfirm.com

AArroyave@ll-lawfirm.com